* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms, with modifications, the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. Plaintiff-employee sustained a compensable injury under the Workers' Compensation Act in the course of his employment with Go Forth Pest Management on March 28, 2002.
3. Plaintiff's average weekly wage is $399.70.
4. At the time of the aforementioned injury, an employee-employer relationship existed between plaintiff and defendant-employer. Casualty Reciprocal Exchange is the carrier on the risk.
5. Defendants have paid the plaintiff compensation at the rate of $266.47 per week from April 2, 2002.
 * * * * * * * * * * *
Based upon all the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 38 years old. He graduated from high school and received training as a forklift operator and certification as a termite technician from Guilford Technical Community College. Plaintiff's past work experience includes working in a warehouse, operating a forklift and driving a school bus.
2. Prior to his employment with defendant-employer, plaintiff had sought medical evaluation and treatment for chronic neck and shoulder pain. In March 2000, plaintiff underwent a cervical MRI, which revealed a large central disc herniation at C6-7, a large herniated disc at C5-6, and a small central disc herniation at C4-5. Plaintiff continued to experience neck and shoulder pain periodically, and treated it with over-the-counter pain medicines. His neck and shoulder pain did not prevent him from carrying out his job duties in his work for defendant prior to his injury by accident.
3. Plaintiff began working for defendant-employer as a termite technician in June 2000. His primary responsibility was applying pesticide treatments to clients' homes. This job required digging trenches, drilling holes in wood and concrete, and spraying chemicals. Plaintiff's normal work hours were from 7:30 a.m. to somewhere in the range of 4:30 to 6:00 p.m., Monday through Friday. Plaintiff was paid at the rate of approximately $9.70 per hour.
4. Plaintiff's injury by accident occurred on or about March 28, 2002, while he was operating a drill under the deck of a client's residence. At the hearing before the Deputy Commissioner, plaintiff testified that he was bending over operating the drill when the drill bit became caught in the brick foundation, causing his body to be twisted and yanked. He experienced an immediate sharp pain from the top of his head to his neck and the middle of his back. Plaintiff reported the accident to his supervisor, Scott Spillman, that same day.
5. On April 1, 2002, plaintiff presented to Debbie Smothers, a nurse practitioner, at MedCentral. Plaintiff reported that he was bending over while drilling when he experienced pain in his neck and down into his right shoulder and mid-back. Plaintiff explained that this pain caused stiffness, sleeplessness and decreased sensation in his left arm. The examination was positive for muscle spasms and revealed limited range of motion of the neck. The nurse practitioner diagnosed plaintiff with a right trapezius strain and prescribed Naproxen, Flexeril, and Skelaxin. Plaintiff was placed on light duty restrictions and advised to apply alternating heat and cold packs to the problem areas.
6. Plaintiff continued to experience pain and discomfort in his neck, right shoulder and right arm, and his symptoms worsened in severity. He attempted to work on Monday, April 1, 2002, but was unable due to his pain. Defendant-employer sent him home because he was physically unable to perform his duties and at the time of the hearing before the Deputy Commissioner, plaintiff had still not returned to work.
7. On April 5, 2002, plaintiff returned to MedCentral and was referred for physical therapy for his continued complaints. On a physical therapy evaluation form, plaintiff was noted to have "constant right greater than left cervical pain as well as scapular pain and cervical pain as well as left sided symptoms including numbness and tingling in a glove distribution to the hand." After approximately five sessions, plaintiff was discharged from physical therapy pending additional follow-up with a physician, as plaintiff was unable to tolerate the exercises and the sessions caused him increased pain.
8. On April 18, 2002, plaintiff was seen at MedCentral for a follow-up visit at which time he reported his pain was no better. At this time, plaintiff was assessed with a right trapezius strain and cervical strain and was referred for an appointment with an orthopedic specialist. Plaintiff remained under light duty work restrictions until his appointment with an orthopedic specialist. Defendant-employer was unable to accommodate his restrictions, so he remained out of work.
9. On April 22, 2002, defendants filed a Form 60, [Employer'sAdmission of Employee's Right to Compensation Pursuant to N.C. Gen. Stat. § 97-18(b)], admitting plaintiff's right to compensation in relation to a neck strain.
10. On April 22, 2002, plaintiff presented to Jill Connor, a physician's assistant, at High Point Orthopaedics. Plaintiff complained of right arm and neck pain, numbness and tingling down the spine, and numbness in the left arm. Ms. Connor assessed a cervical strain. She also recommended that physical therapy be suspended and that plaintiff continue with light duty restrictions until his follow-up with orthopedic surgeon, Dr. James McDonald.
11. On May 2, 2002, plaintiff presented to Dr. McDonald at High Point Orthopaedics. Dr. McDonald diagnosed a probable herniated nucleus pulposus of the cervical spine and ordered an MRI scan of the cervical spine. Dr. McDonald removed plaintiff from work until the MRI could be done.
12. On May 9, 2002, plaintiff had a cervical MRI. The radiologist compared the MRI to the one performed prior to the injury in March 2000, and reported that the previous herniations at C5-6 and C6-7 were not visualized on the MRI of 2002.
13. On May 9, 2002, plaintiff presented to Dr. McDonald to review the results of the MRI scan. Based on the results, Dr. McDonald referred plaintiff to a neurosurgeon, Dr. Freund, at Johnson Neurological Clinic for consultation as to whether a cervical myelogram would be warranted. Dr. McDonald also recommended that plaintiff continue his light duty restrictions.
14. Defendants did not authorize the referral to Dr. Freund, but instead arranged for plaintiff to be evaluated by a neurosurgeon, Dr. Gary Cram of Carolina Neurosurgery (formerly Microneurosurgical Specialists of the Central Carolinas).
15. Dr. Cram examined plaintiff on June 28, 2002. Plaintiff reported his pain was "down his right arm into his hand with numbness and tingling and also up and down both shoulders and into his back." Following review of plaintiff's recent films, Dr. Cram noted motion artifact with some possible disk bulging. Dr. Cram recommended a cervical myelogram and CT-scan with flexion and extension to evaluate the extent of plaintiff's neurologic compression.
16. On July 10, 2002, plaintiff underwent a CT myelogram and on July 19, 2002, plaintiff presented to Dr. Cram to review the results of the diagnostic tests. The CT myelogram showed protrusions at C2-3, C4-5, and C5-6, but no disc herniations. None of the diagnostic tests showed any condition for which Dr. Cram would have recommended surgery.
17. On July 23, 2002, Dr. Cram referred plaintiff for an electrodiagnostic ("EMG") and nerve conduction study, which were performed and reported as negative. On August 19, 2002, Dr. Cram referred plaintiff to Dr. Albert Bartko, a specialist in physical medicine and rehabilitation at Guilford Orthopaedic Sports Medicine.
18. On September 6, 2002, plaintiff presented to Dr. Bartko, with complaints of "pain in the neck and trapezius with some radiation into the right greater than left upper extremity and intermittent parasthesias in all digits but more prominent on the left fourth and fifth digits." At that time, Dr. Bartko was of the opinion that the symptoms were resulting from myofascial pain. Dr. Bartko recommended that plaintiff resume physical therapy and prescribed Ultracet and a Transcutaneous Electrical Nerve Stimulation ("TENS") unit.
19. Based on Dr. Bartko's recommendation, plaintiff resumed physical therapy at Southeastern Orthopaedic Specialists. Plaintiff consistently noted continued pain in his right and left shoulders and pain in his neck, with the right-sided complaints being more severe. On September 30, 2002, plaintiff noted sharp shooting pains in the right arm radiating to the pinky, ring and middle fingers and was referred back to Dr. Bartko, who saw him the same day. Plaintiff complained of constant right arm numbness that was greater than that in the left arm. Dr. Bartko did not recommend any additional testing, but sent plaintiff for a Functional Capacity Evaluation ("FCE").
20. On October 9, 2002, plaintiff underwent the FCE, which revealed that there were indications of submaximal effort, some symptom exaggeration behaviors and a few non-organic signs. Plaintiff was found capable of working at the light physical demand level, with no overhead work and forward bending to knee height only.
21. Upon re-examination on October 11, 2002, Dr. Bartko noted that plaintiff's symptoms of right and left-sided pain, with the right side being more severe than the left, continued to remain unchanged. Dr. Bartko released plaintiff at maximum medical improvement with a two percent (2%) permanent impairment rating to his back. Dr. Bartko also released plaintiff to return to work with permanent light duty restrictions pursuant to the FCE. There is no evidence that the defendant-employer had any employment available within these restrictions.
22. On March 31, 2003, plaintiff again presented to Dr. Bartko with continued symptoms of the same persistent pain, which remained unchanged from the previous examination in October 2002. Dr. Bartko recommended that plaintiff continue with the restrictions as were set forth in the FCE, continuing to opine that plaintiff's symptoms were myofascial in nature.
23. On April 7, 2003, plaintiff underwent an independent medical evaluation with Dr. Vincent E. Paul, an orthopedic surgeon. Plaintiff complained of pain and soreness at the base of the neck and tingling in the left arm. Dr. Paul diagnosed a cervical sprain/strain pattern, myofascial syndrome, trapezius trigger points, possible plexitis, and occipital neuralgia. He recommended epidural and trigger point injections and Neurontin. Dr. Paul assigned a five percent (5%) impairment rating to the neck and released plaintiff to return to work with light duty restrictions.
24. In August 2003, plaintiff was assigned to Mr. David Morgan, CRC, a vocational rehabilitation case manager, for assistance with job placement, as defendants were unable to accommodate plaintiff's physical restrictions. An initial meeting occurred on August 20, 2002, at which time plaintiff advised Mr. Morgan that he had continued and persistent symptoms of pain and physical discomfort and he was seeking additional treatment for his condition.
25. In his initial vocational report, Mr. Morgan indicated that plaintiff would be referred for opportunities as a security guard, in addition to a number of other types of positions including cashier, machine operator, assembler, courier, and parking lot attendant. Mr. Morgan was aware of plaintiff's preference for full-time work, and regular hours during the week. Due to his involvement in his church community and with his children, plaintiff was reluctant to pursue work that involved weekend and evening hours.
26. Mr. Morgan presented plaintiff with security officer opportunities that offered only part-time, evening and weekend hours. On October 7, 2003, Mr. Morgan referred plaintiff to Guarantee Protection Services, a security guard staffing company based out of Greensboro, North Carolina to complete an employment application. On November 14, 2003, Mr. Morgan also referred plaintiff to Reentech Security.
27. On November 21, 2003, plaintiff interviewed with Reentech and was offered the opportunity to attend their training class. An offer of employment would not be considered by Reentech or made to plaintiff until after the successful completion of the training class. Plaintiff would also be responsible for the $300 cost of the class should he be unable to successfully complete the training, which included a firearms component and a classroom component. Reentech was unable to provide any specific details regarding work availability, work hours, and work locations.
28. In a letter to Dr. Bartko dated December 4, 2003, Mr. Morgan indicated that the security guard position was an armed position performing foot patrol at grocery stores in Greensboro and High Point, and would be a fill-in floater position until the company obtained additional accounts. On this basis, the job was considered temporary, part-time work.
29. Although Dr. Bartko initially approved the security guard position, subsequent testimony from plaintiff's treating physicians, including Dr. Bartko, revealed that firearms training would not be recommended for plaintiff, given his neck condition, until after surgical repair. Dr. Cram also had concerns about the use of firearms and opined that it would not be suitable until after plaintiff's neck surgery. In his testimony, Dr. Paul also expressed concern that the security guard position had the potential to physically harm plaintiff.
30. Plaintiff testified that from August 2003 to March 2004, he submitted at least 40 employment applications, in addition to making other inquiries about jobs. However, his counselor was unable to confirm all the contacts.
31. At the hearing before the Deputy Commissioner, Mr. Morgan did testify that plaintiff applied for approximately 30 to 40 jobs and to his knowledge, plaintiff was never offered a full-time position.
32. The Full Commission finds that plaintiff did demonstrate a willingness to cooperate with defendant's rehabilitation efforts.
33. On January 23, 2004, plaintiff returned to see Dr. Bartko, with complaints of continued pain, with the right side being more severe than the left. Plaintiff also complained of numbness and tingling in his left arm. Dr. Bartko did not see a significant change in plaintiff's physical exam, except for the complaints of numbness and tingling in the left upper extremity. Dr. Bartko recommended a repeat EMG study of the left upper extremity, which Dr. Bartko conducted on February 4, 2004, and which was normal.
34. On Wednesday, February 11, 2004, plaintiff returned to Dr. Bartko for acute onset of right neck and shoulder girdle pain. Plaintiff reported the onset the previous Sunday morning, which would have been February 8, 2004. Dr. Bartko recommended an MRI, which was performed on March 2, 2004. The MRI revealed a protruding disc in the central right paracentral distribution at the C6-7 level resulting in concave deformity of the anterior central and right paracentral thecal sac.
35. After reviewing the MRI findings, Dr. Bartko discussed with plaintiff his treatment options, including injections or possibly surgery. Plaintiff underwent a C7-T1 interlaminar epidural steroid injection, which provided some temporary relief, but plaintiff returned to baseline thereafter. On March 24, 2004, Dr. Bartko noted that plaintiff may be a candidate for surgical intervention and referred him to Dr. Cram.
36. On April 26, 2004, plaintiff presented to Dr. Cram for recurrence of severe neck and right arm pain. Dr. Cram reviewed plaintiff's March 2, 2004, MRI, which revealed a significant disc herniation at C6-7 compressing the right C7 nerve root. Dr. Cram recommended decompression surgery and fusion of the affected areas and removed plaintiff from work.
37. Dr. Cram testified that the March 28, 2002, injury most likely aggravated the plaintiff's condition for which he was now seeking treatment. He further explained that a herniation related to an injury might occur over a period of time after the injury. An event can weaken the disk and cause an annular tear. Over time the weakness in the disk can progress, the tear can expand and then you could either develop a protrusion or a herniation.
38. Dr. Bartko testified that plaintiff's complaints of symptoms in the neck and right shoulder early in the case "could be consistent with a disk wall tear that may have ultimately precipitated his disk herniation." Dr. Bartko's testimony is consistent with Dr. Cram's that a disk wall can tear, which allows leakage of nuclear material that can inflame a nerve root and create the same radicular symptoms as an overt disk herniation. Although he could not determine "conclusively," Dr. Cram did believe it was "more probable than not" that plaintiff's disk problems relate to the work injury.
39. Dr. Paul testified that the history of the disks being herniated in 2000 and the symptoms clearing is "most consistent with the new injury aggravating the problem."
40. Subsequent to the hearing before the Deputy Commissioner, defendant engaged the services of Dr. Robert W. Elkins, an orthopedic surgeon, who performed an independent medical review based solely on the medical records. Dr. Elkins performs evaluations in North Carolina and Florida, but personally treats few patients. Dr. Elkins opined that plaintiff's problems were myofascial in nature, and that his disk herniation was not related to his work accident.
41. In weighing the evidence, the Full Commission affords greater weight to the opinions of Dr. Bartko and Dr. Cram, who have both examined plaintiff, reviewed original test results, and followed plaintiff's course of treatment than to the opinion of Dr. Elkins, who did not examine plaintiff.
42. The greater weight of the medical evidence supports, and the Full Commission finds that the plaintiff's herniation at C6-7, which was present on the March 2, 2004, MRI is causally related to the plaintiff's March 28, 2002, work accident. The Full Commission further finds that the plaintiff's work-related accident of March 28, 2002, aggravated his pre-existing neck condition and ultimately resulted in the disk herniation.
43. The greater weight of the competent evidence indicates that the surgery recommended by Dr. Cram, decompression surgery and fusion, is necessary to treat plaintiff's C6-7 disc herniation and to effect a cure, provide relief or lessen plaintiff's period of disability.
44. The greater weight of the evidence shows that the security guard position was not suitable employment and therefore plaintiff's refusal to accept this employment was justified. Defendants have not shown that suitable employment within plaintiff's restrictions was identified or available.
45. The Full Commission finds that although vocational rehabilitation is pre-mature until such time as plaintiff has completed or elected to forego the surgery approved herein, plaintiff affirmatively established his willingness to cooperate with defendant's offers of rehabilitative services.
46. The Full Commission finds that plaintiff has been unable to earn wages in the same or any other employment since April 1, 2002, due to his neck injury on March 28, 2002.
47. Plaintiff's average weekly wage was $399.70, which yields a compensation rate of $266.47.
48. Plaintiff received a total of $4,845.00 in unemployment compensation for the period of time from April 6, 2003, through October 25, 2003.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On or about March 28, 2002, plaintiff sustained an injury by accident to his neck as a result of a specific traumatic incident of the work assigned, arising out of and in the course of his employment with the defendant-employer that aggravated his pre-existing neck and shoulder conditions. N.C. Gen. Stat. §97-2(6).
2. Plaintiff was justified in not accepting the security guard position, which was not within his restrictions and therefore, not suitable employment. N.C. Gen. Stat. § 97-32; McLean v.Eaton Corp., 125 N.C. App. 391, 481 S.E. 2d 289 (1997).
3. As a result of his compensable injury by accident, plaintiff is entitled to compensation for temporary total disability payable at the rate of $266.47 from April 1, 2002, and continuing each week thereafter until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
4. As a result of his compensable injury by accident, plaintiff has incurred and continues to incur expenses for medical treatment that is necessary to effect a cure, provide relief or lessen his period of disability. The plaintiff is entitled to payment of said expenses by defendants, including the surgery proposed by Dr. Cram, and assented to by Dr. Bartko. N.C. Gen. Stat. §§ 97-2(19), 97-25.
5. Defendants are entitled to a credit for the unemployment compensation that was paid to plaintiff from April 6, 2003, through October 25, 2003, in the amount of $4,845.00 against any compensation due plaintiff under N.C. Gen. Stat. §§ 97-29 or97-30. N.C. Gen. Stat. § 97-42.
6. Plaintiff affirmatively established his willingness to cooperate with defendant's offers of rehabilitative services. N.C. Gen. Stat. § 97-25. Scurlock v. Durham County GeneralHospital, 136 N.C. App. 144, 523 S.E. 2d 439 (1999).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to an attorney's fee approved herein, defendants shall pay total disability compensation benefits to plaintiff at the rate of $266.47 from April 1, 2002, and continuing each week thereafter until further Order of the Industrial Commission. All compensation that has accrued shall be paid in one lump sum, also subject to the attorney's fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his compensable injury by accident on March 28, 2002, including the surgery proposed by Dr. Cram, and assented to by Dr. Bartko, for so long as such evaluations, examinations, treatments and surgery may be reasonably required to effect a cure or give relief or will tend to lessen the period of plaintiff's disability.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded herein is approved for plaintiff's counsel of record. This fee shall be deducted from the amounts due plaintiff and paid directly to his counsel; thereafter, defendants shall pay to plaintiff's counsel every fourth check due plaintiff.
4. At such time following plaintiff's surgery, as he is released to return to work, or in the event that such surgery is postponed or not pursued, then at that time, plaintiff shall comply with defendant's reasonable efforts at vocational rehabilitation, consistent with any restrictions that may be imposed by his treating physician.
5. Defendants are entitled to a credit for the unemployment compensation that was paid to plaintiff from April 6, 2003, through October 25, 2003, in the amount of $4,845.00 against any compensation due plaintiff.
6. Defendants shall pay the costs.
This the __ day of March 2006.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_________________ CHRISTOPHER SCOTT COMMISSIONER